S12G1924. ST. SIMONS WATERFRONT, LLC v. HUNTER, MACLEAN, EXLEY & DUNN, P.C.
(746 SE2d 98)

HUNSTEIN, Chief Justice.

This appeal arises from a discovery dispute in a legal malpractice action, in which Appellant St. Simon's Waterfront, LLC ("SSW") sued its former law firm, Appellee Hunter, Maclean, Exley & Dunn, P.C. ("Hunter Maclean"), over its representation in a commercial real estate venture. During the litigation, SSW sought the production of communications between Hunter Maclean attorneys and the firm's in-house general counsel, which took place during the firm's ongoing representation of SSW, in anticipation of potential malpractice claims by SSW. Hunter Maclean asserted that the materials were protected from disclosure by the attorney-client privilege and work product doctrine, but the trial court disagreed and ordered their production. On appeal, the Court of Appeals vacated the trial court's order and remanded for further consideration. *Hunter, Maclean, Exley & Dunn, P.C. v. St. Simons Waterfront, LLC*, 317 Ga. App. 1 (730 SE2d 608) (2012).

We granted certiorari to examine the applicability of the attorney-client privilege and work product doctrine in the law firm in-house counsel context. We now hold that the same basic analysis that is conducted to assess privilege and work product in every other variation of the attorney-client relationship should also be applied to the law firm in-house counsel situation. We hold further that the Georgia

Rules of Professional Conduct do not govern the applicability of the attorney-client privilege or work product doctrine, and therefore the conflict of interest that may arise between the firm and the client when the firm begins acting in its own defense does not affect the protections afforded to privileged communications and attorney work product. In light of our analysis, we vacate the judgment of the Court of Appeals.

In 2006, SSW retained Hunter Maclean in connection with a condominium development project on St. Simons Island. Hunter Maclean attorneys drafted a form purchase contract for SSW's use in "pre-selling" the condo units prior to their construction. In late 2007 and early 2008, several purchasers gave SSW notice of their intent to rescind, in some cases citing alleged defects in the purchase contract.

Following a February 2008 conference call with SSW regarding the attempted rescissions, the participating attorneys informed Hunter Maclean's in-house general counsel, Arnold Young, of their belief that SSW blamed the firm and would seek to hold it responsible for the rescissions. Young, who had no involvement in SSW matters, interviewed the attorneys involved and within days sought advice from outside counsel regarding the situation. The firm also continued representing SSW in closings and in negotiating with rescinding purchasers while looking for replacement counsel for SSW. In March 2008, SSW retained another law firm to take over the representation as to the rescinding purchasers and to pursue potential action against Hunter Maclean; new counsel requested, however, that Hunter Maclean continue to handle the ongoing closings, which Hunter Maclean did until June 2008.

In 2009, SSW filed suit against Hunter Maclean, asserting claims for legal malpractice, breach of fiduciary duty, and fraud in connection with its representation in the condominium transactions and its conduct once the firm's interests became adverse to SSW's. During discovery, SSW sought to depose and obtain documents from Hunter Maclean's outside counsel as well as from Hunter Maclean attorneys, including Young, its in-house counsel. Hunter Maclean objected and sought protective orders based on the attorney-client privilege and work product doctrine; SSW moved to compel the depositions of Young and four other Hunter Maclean attorneys and the production of certain documents identified on Hunter Maclean's privilege log.

The trial court granted the motion to compel except as to the firm's communications with outside counsel, which it found to be privileged. Regarding the communications among the firm's attorneys and in-house counsel Young, the trial court held that any privilege they may have enjoyed was abrogated due to the conflict of

interest that had developed between the firm and SSW. See State Bar Rule 4-102 (d), Ga. Rules of Professional Conduct, Rule 1.7 (a). Specifically, the trial court held that Hunter Maclean was engaged in efforts to defend itself against SSW while simultaneously continuing to represent SSW, without advising SSW of'the conflict; that the conflict between the involved attorneys and SSW must be imputed to Young under Rule 1.10 of the Georgia Rules of Professional Conduct; and that any privilege within the firm was negated by this conflict of interest.

On interlocutory appeal, Hunter Maclean challenged the trial court's ruling as to Young, and SSW challenged the ruling as to outside counsel. The Court of Appeals, in a carefully considered opinion, examined other jurisdictions' approaches to the issue of privilege as applied to law firm in-house counsel; determined that none of those approaches addresses the issue in a way that is entirely consistent with Georgia law; and developed its own framework to analyze the privilege issue. Specifically, the Court of Appeals' framework assessed the nature of the communications at issue; the structure of the in-house counsel position; and the extent to which the client gave informed consent, in conformity with the Rules of Professional Conduct, to the firm's undertaking defensive measures in anticipation of litigation during its ongoing representation of the client. We now restructure this framework to fit within the parameters of Georgia's general law on privilege and work product and to remove the Rules of Professional Conduct from the analysis.

1. The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U. S. 383, 389 (II) (101 SCt 677, 66 LE2d 584) (1981). The privilege has long been recognized in Georgia, see *Fire Assn. of Philadelphia v. Fleming*, 78 Ga. 733 (3) (3 SE 420) (1887), and is currently codified as follows: "There are certain admissions and communications excluded from evidence on grounds of public policy, including ... [c]ommunications between attorney and client." OCGA § 24-5-501 (a) (2).[1] The privilege generally attaches when legal advice is sought from an attorney, and operates to protect from compelled disclosure any communications, made in confidence, relating to the

---

[1] Prior to the adoption of the 2013 Georgia Evidence Code, there were four different statutes in our Evidence Code addressing the attorney-client privilege. Paul S. Milich, *Georgia Rules of Evidence*, § 21:1, at 848-849 (2012-2013 ed.). The new Code greatly simplified the statutory language constituting the privilege and eliminated certain "awkward language" in the prior statutes. Id. at 849. Notwithstanding these changes, the rules governing the privilege in Georgia generally remain the same. Id.

matter on which the client seeks advice. Paul S. Milich, *Georgia Rules of Evidence*, § 21:1, at 849 (2012-2013 ed.). The purpose of the privilege is

> to encourage full·and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co.*, 449 U. S. at 389. However, because recognition of the privilege operates to exclude evidence and thus impede the truth-seeking process, the privilege is narrowly construed. *Tenet Healthcare Corp. v. Louisiana Forum Corp.*, 273 Ga. 206 (1) (538 SE2d 441) (2000).

It is well settled law in Georgia that the attorney-client privilege generally applies in the context of communications between in-house corporate counsel and the corporation's management and employees. See *Southern Guar. Ins. Co. v. Ash*, 192 Ga. App. 24, 27 (383 SE2d 579) (1989) ("once an attorney-client relationship has been duly established between an attorney and his corporate client . . . [,] the legal advice confidentially communicated to the authorized agents of the client is by statute protected from discovery" (emphasis omitted)); *Marriott Corp. v. American Academy of Psychotherapists*, 157 Ga. App. 497 (3) (277 SE2d 785) (1981) (recognizing privilege for communications from a corporation's employee to its in-house counsel); see also *Upjohn Co.*, 449 U. S. at 389-390 (II) (recognizing privilege for in-house corporate counsel under federal common law).

This Court has never addressed the parameters of the attorney-client privilege in the context of communications involving a law firm's in-house counsel. In considering this issue, courts in other jurisdictions have reached different results. Some have concluded that intra-firm communications regarding a current firm client are not entitled to privilege under any circumstances, due to the fiduciary relationship between the firm and its client. See, e.g., *Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 FRD 283, 285-286 (E.D. Pa. 2002) (no attorney-client privilege for intra-firm communications regarding potential legal action by current client against law firm); *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 220 FSupp.2d 283, 287 (S.D. N.Y. 2002) (same); *SonicBlue, Inc. v. Portside Growth and Opportunity Fund*, 2008 Bankr. LEXIS 181, at *26 (Bankr. N.D. Cal. Jan. 18, 2008)

(same). Other courts have held that the privilege applies only in limited circumstances. See, e.g., *Thelen Reid & Priest, LLP v. Marland*, 2007 U. S. Dist. LEXIS 17482 (N.D. Cal. Feb. 21, 2007) (recognizing confidentiality of consultations with in-house ethics adviser but requiring disclosure of in-firm communications made after firm learned of client's adverse claim). Still others have held that the privilege does apply or that it applies with narrow exceptions. See, e.g., *TattleTale Alarm Systems v. Calfee, Halter & Griswold, LLP*, 2011 U. S. Dist. LEXIS 10412 (S.D. Ohio, Feb. 3, 2011) (applying attorney-client privilege and rejecting client's access to documents for failure to show "good cause"); *Garvy v. Seyfarth Shaw LLP*, 966 NE2d 523, 538 (Ill. App. 2012) (rejecting arguments against application of the attorney-client privilege when law firm sought legal advice concerning client's legal malpractice claim while continuing to represent client).

Having examined these varying approaches and considered their underlying rationales, we have determined that the best course is simply to analyze the privilege issue here as we would in any other lawsuit in which the privilege is asserted. Our general rules on the attorney-client privilege provide that the privilege attaches where (1) there is an attorney-client relationship, see Milich, § 21:2, at 850; (2) the communications in question relate to the matters on which legal advice was sought, see id. § 21:1, at 849; (3) the communications have been maintained in confidence, see id. § 21:6, at 856; and (4) no exceptions to privilege are applicable, see id. §§ 21:17, 21:18, at 871-875. See also *Southern Guar. Ins. Co. v. Ash*, 192 Ga. App. at 29 ("once an attorney-client relationship has been duly established between an attorney and his corporate client . . . [,] the legal advice confidentially communicated to the authorized agents of the client is by statute protected from discovery" (emphasis omitted)). We now examine each of these factors as applied specifically in the law firm in-house counsel context.[2]

(1) *Existence of attorney-client relationship.* To assess the existence of an attorney-client relationship in the law firm in-house counsel context, the trial court must determine that the attorney purporting to act as the firm's in-house counsel was actually acting in that capacity with regard to anticipated legal action against the firm or other matters related to the firm's compliance with its legal and ethical obligations. The firm should be clearly established as the

---

[2] We note that the discussion of these factors is for illustrative purposes, and we reiterate that cases such as this are governed by the laws of privilege set forth in our statutes and precedent.

client before or in the course of the in-firm communication for the attorney-client privilege to attach. Whether the firm has attained the status of its in-house counsel's "client" in a given situation is a fact-based determination, which may depend in part on the procedures undertaken to establish the potential or actual malpractice claim against the firm as a matter distinct from the firm's underlying representation of the client asserting the claim. For example, the utilization of billing procedures that recognize the firm itself as the client help to establish this distinction. See Elizabeth Chambliss, *The Scope of In-Firm Privilege*, 80 Notre Dame L. Rev. 1721, 1749 (2005). See also Barbara S. Gillers, *Preserving the Attorney Client Privilege for the Advice of a Law Firm's In-House Counsel*, 2000 Prof. Law. 107, 111 (2000) (recommending that firms distinguish between "the firm lawyers who are the clients and the firm lawyers who are the counsel"). In addition, the maintenance of a separate file for communications and work product related to the claim against the firm, which is not commingled with the actual client file, helps distinguish the firm as the in-house counsel's client and the claim against the firm as a matter independent of the underlying representation.

The level of formality associated with the position of firm in-house counsel may also be relevant in assessing the existence of an attorney-client relationship. For example, where the in-house counsel holds a full-time position as firm counsel to the exclusion of other work, it should be easier to establish the existence of attorney-client relationship between counsel and the firm with respect to a given matter. See Chambliss, 80 Notre Dame L. Rev. at 1748. The less formality associated with the position, and the more the in-house counsel is involved in the representation of firm clients, the greater will be the significance of other factors, such as billing and record-keeping, in assessing the existence of an attorney-client relationship between in-house counsel and the firm.[3]

The above discussion depends on the assumption that it is permissible for an attorney from within a law firm to represent the firm against a current firm client. We acknowledge that such an arrangement appears inconsistent with the Georgia Rules of Professional Conduct to the extent the Rules prohibit conflicts of interest

---

[3] As Professor Milich notes, the attorney-client relationship "is formed the moment the client seeks the attorney's professional services, regardless of whether the attorney is ultimately hired." Milich, § 21:2, at 850. This opinion does not alter that basic rule. Rather, we attempt in this opinion to clarify when, in the in-house law firm context, firm lawyers communicating with firm in-house counsel will be considered to be "seeking the professional services" of firm counsel, as opposed to consulting with a colleague as part of their representation of a client or discussing general firm business.

and impute individual attorney conflicts to all attorneys within a law firm. See Rule 1.7 (a) ("[a] lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests . . . will materially and adversely affect the representation of the client"); Rule 1.10 ("[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so"). At the point firm attorneys seek advice from in-house counsel regarding a perceived or actual malpractice claim by a current firm client, these attorneys have developed interests adverse to those of the firm's client; under Rule 1.10, these adverse interests would be imputed to all attorneys within the firm, including in-house counsel. This automatic imputation of one attorney's conflicts to all other attorneys in the firm is the basis on which some courts have refused to recognize any privilege for intra-firm communications. See, e.g., *Bank Brussels*, 220 FSupp.2d at 288 (denying in-house counsel privilege on grounds that "a conflict as to one attorney at a firm is a conflict as to all"); *SonicBlue*, 2008 Bankr. LEXIS 181, at *27 (privilege cannot be asserted where communications in question arose "out of self-representation that creates an impermissible conflicting relationship with [the] outside client").

While we acknowledge that the principle of imputed conflicts may present ethical problems for firms employing in-house counsel, we do not believe that potential ethics violations are relevant to the attorney-client privilege determination. In promulgating our Rules of Professional Conduct, the State Bar has stated bluntly that the Rules "are not intended to govern or affect judicial application of either the attorney-client or work product privilege." Ga. Rules of Professional Conduct, Preamble, ¶ 19. As further noted in the Preamble,

> the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. *Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.*

(Emphasis supplied.) Id. at ¶ 18. Given this clear pronouncement, we conclude that the potential existence of an imputed conflict of interest between in-house counsel and the firm client is not a persuasive basis

for abrogating the attorney-client privilege between in-house counsel and the firm's attorneys. Accord *TattleTale Alarm Systems*, 2011 U. S. Dist. LEXIS 10412, at *24 (noting "widely accepted" principle that "the attorney's failure to comply with ethical norms should not deprive the client of the benefit of the attorney-client privilege"); *Garvy v. Seyfarth Shaw*, 966 NE2d at 538 (explaining that violation of ethics rules "has no relevance to the issue of whether the documents in question are protected by the attorney-client privilege").

Thus, to summarize, so long as an actual attorney-client relationship has been formed, with the firm clearly established as the client of the in-house counsel, the privilege may attach to their communications so long as the other requisites of the privilege are met.[4]

(2) *Communications related to purpose for which legal advice was sought.* In general, the privilege attaches only to communications "made in the course of an attorney-client relationship." Milich, § 21:15, at 866. In addition, the communication must have been made for the purpose of getting or giving legal advice. *Southern Guar. Ins. Co. v. Ash*, 192 Ga. App. at 27-28; *Marriott Corp.*, 157 Ga. App. at 505 (3) (d). Within a corporation, communications with counsel by employees must be regarding subject matter within the employee's scope of employment. Id. In the law firm in-house counsel context, these principles require that the communications be made between the in-house counsel in its capacity as firm counsel and the firm's attorneys in their capacity as representatives of the client, the law firm, regarding matters within the scope of the attorneys' employment with the firm. See *Upjohn Co.*, 449 U. S. at 403 (Burger, C. J.,

---

[4] We do not purport here to render any opinion regarding a law firm's compliance or non-compliance with the Rules of Professional Conduct in undertaking defensive action against a current client. We granted certiorari in this case exclusively to address the rules governing the attorney-client privilege and attorney work product doctrine in the law firm in-house counsel context, and this opinion is intended to do that and no more. Issues of privilege and work product aside, we acknowledge that thorny ethical issues remain for law firms in handling the conflict of interest that arises when they perceive a current client is considering legal action against them. See Rule 1.7 (a) (actual conflicts); Rule 1.10 (imputed conflicts). These issues concern, for example, duties regarding disclosure, see Rule 1.4 (a); informed consent, see Rule 1.7; and withdrawal, see Rule 1.16. We emphasize that this opinion is not intended to resolve the ethical quandary and instead addresses only the evidentiary questions of privilege and work product.

However, we also do not intend to minimize the importance of the ethical quandary. As evidenced by the briefs of the parties and several amici, attorneys practicing in this State are eager for guidance in navigating the ethical pitfalls presented when a firm suspects its client is contemplating claims against it. We thus encourage those interested in the resolution of these ethical issues to appeal to the State Bar for guidance on, clarification of, and possible amendments to our Rules of Professional Conduct, to enable law firms and their attorneys to effectively defend themselves against potential malpractice claims while remaining compliant with their ethical obligations.

concurring) (privilege attaches when employee communicates with attorney "regarding conduct or proposed conduct within the scope of employment").

(3) *Communications maintained in confidence.* The privilege does not attach to communications "made by lawyers to their corporate or individual clients which are not of a confidential nature." *Southern Guar. Ins. Co. v. Ash,* 192 Ga. App. at 28. Thus, as in all other contexts, preservation of the privilege for communications with law firm in-house counsel depends on maintaining their confidentiality. See Milich, § 21:6, at 856. In the corporate context, that means the communications are confined to "employees within the corporate structure who are authorized, expressly or by business practice, to receive and act thereon." *Southern Guar. Ins. Co. v. Ash,* 192 Ga. App. at 28. See *Marriott Corp.,* 157 Ga. App. at 505 (3) (d) (communication must not be "disseminated beyond those persons who, because of the corporate structure, need to know its contents"). As applied within law firms, this principle means that, in order to maintain privileged status, intra-firm communications regarding the client's claims against the firm should generally involve only in-house counsel, firm management, firm attorneys, and other firm personnel with knowledge about the representation that is the basis for the client's claims against the firm.[5]

(4) *No exception to the privilege applies.* Georgia law recognizes an exception to the attorney-client privilege for communications in furtherance of a crime, fraud, or other unlawful end. Milich, § 21:17, at 871; see *Marriott Corp.,* 157 Ga. App. at 502 (3) (b). Thus, to the extent there is an allegation that in-house counsel has been employed by firm attorneys in an effort to defraud rather than merely defend against a client, the privilege may be waived.

Some jurisdictions also recognize a "fiduciary" or "fiduciary duty" exception. This exception holds that one who is acting in a fiduciary capacity cannot assert privilege to shield its communications with counsel from the beneficiary of the fiduciary relationship. See, e.g.,

---

[5] This narrow field of firm employees who are permitted to be privy to the communications at issue may widen if the communications in question relate not to the adverse claims of a current client but rather to general ethics and compliance-related advice disseminated firm-wide by in-house counsel in its capacity as such. See *Southern Guar. Ins. Co. v. Ash,* 192 Ga. App. at 27-28 (privilege attaches to communications from in-house corporate counsel in the nature of both "legal advice given in regard to specific cases pending and legal advice concerning day-to-day business matters"). As long as the communications are made within the context of an established attorney-client relationship, the privilege will extend both to "confidentially communicated legal advice that is requested specifically by the [firm or its attorneys]" and to "preventive legal advice that is confidentially provided sua sponte by the lawyer to the authorized agents of the [firm]." Id. at 28.

*United States v. Mett,* 178 F3d 1058, 1062-1064 (9th Cir. 1999) (applying fiduciary exception and its rationale to trustee of a pension benefit plan). Until this case, the appellate courts of this State have never considered whether to adopt the "fiduciary exception" in any situation, including the law firm in-house counsel context. Without deciding whether the exception may apply in the context of other fiduciary relationships, we decline to adopt it here.

The fiduciary exception developed from nineteenth century English trust law, which held that legal advice obtained by the trustee for the benefit of the trust was not protected from disclosure to trust beneficiaries. See *United States v. Jicarilla Apache Nation,* ___ U. S. ___ (II) (A) (131 SCt 2313, 180 LE2d 187) (2011). Courts in the United States have relied on one of two rationales in adopting the exception. One rationale holds that the importance of the trustee's duty to the beneficiaries trumps the goals served by the attorney-client privilege. The other holds that, because the trustee acts as a representative of the beneficiaries, the beneficiaries are the attorney's "real client" and should therefore be privy to the communications. *United States v. Mett,* 178 F3d at 1063.

The "real client" rationale clearly does not apply in the law firm in-house counsel context, because it depends on the existence of a mutuality of interest between the firm/firm attorneys as fiduciaries and the firm client as beneficiary of the fiduciary relationship. See *United States v. Jicarilla Apache Nation,* 131 SCt at 2322; *In re Atlantic Financial Mgmt. Securities Litigation,* 121 FRD 141, 146 (D. Mass. 1988) ("[t]he key element is the mutuality of interests between a fiduciary and the beneficiary"). Attorneys within a firm seeking advice to defend against threatened litigation by a current client clearly do not share a mutuality of interest with that client. Therefore, the fiduciary exception does not apply in the present context under this rationale. See *Garvy v. Seyfarth Shaw,* 966 NE2d at 535 ("the fiduciary-duty exception does not . . . apply to legal advice rendered . . . in anticipation of adversarial legal proceedings against the fiduciary").

The "fiduciary duty trumps privilege" rationale is more commonly invoked in applying the fiduciary exception to the law firm in-house counsel context. In those instances, courts have reasoned that the duty of loyalty owed by the firm's attorneys to the firm's client supersedes any privilege that the firm's attorneys might otherwise enjoy for their communications with in-house counsel. Mark J. Fucile, *The Double-Edged Sword: Internal Law Firm Privilege and the "Fiduciary Exception",* 76 Def. Couns. J. 313, 313 (2009); see also *Koen Book Distributors,* 212 FRD at 286 (firm's fiduciary duty to its client "is paramount to its own interests"); *SonicBlue,* 2008 Bankr.

LEXIS 181, at *28 ("the very nature of the attorney-client relationship exceeds other fiduciary relationships").

We have previously concluded that the breach of an attorney's duty of loyalty is an issue of legal ethics and professional responsibility collateral to, and not directly bearing on, privilege law. For the same reasons we decline to engraft our Rules of Professional Conduct onto our privilege law, we also reject the notion that the attorney's duty of loyalty should automatically trump the privilege. Specifically, this approach ignores our State Bar's admonition that the Rules of Professional Conduct are not intended to affect the law of privilege. It also discounts the importance of the distinct duty of loyalty owed by the in-house counsel to his firm. Thus, we decline to adopt the fiduciary exception to the attorney-client privilege in this context.

In summary, the attorney-client privilege applies to communications between a law firm's attorneys and its in-house counsel regarding a client's potential claims against the firm where (1) there is a genuine attorney-client relationship between the firm's lawyers and in-house counsel; (2) the communications in question were intended to advance the firm's interests in limiting exposure to liability rather than the client's interests in obtaining sound legal representation; (3) the communications were conducted and maintained in confidence; and (4) no exception to the privilege applies. On remand, the burden will be on Hunter Maclean, the proponent of the privilege, to establish that the privilege exists with evidence that these four elements have been satisfied. See *Southern Guar. Ins. Co. v. Ash*, 192 Ga. App. at 29.

2. Turning to the attorney work product doctrine, we analyze this issue, as we did with attorney-client privilege, using the standard rules that govern the doctrine in other contexts. OCGA § 9-11-26 (b) (3) generally prohibits the compelled disclosure of materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" unless the party seeking their disclosure shows (1) that it has a "substantial need" for the materials to prepare its case and (2) that it is "unable without undue hardship to obtain the substantial equivalent of the materials by other means." *WellStar Health System v. Jordan*, 293 Ga. 12, 17 (743 SE2d 375) (2013). Even if the requisite showing is made to compel disclosure under this standard, absolute protection is still afforded to "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." OCGA § 9-11-26 (b) (3). See *McKinnon v. Smock*, 264 Ga. 375 (2) (445 SE2d 526) (1994). Where otherwise discoverable materials contain

such "mental impressions," the trial court may need to conduct an in camera review to ensure those portions are redacted prior to production. Id. at 376 (2).

We have previously held that "the work product doctrine does not apply to the situation in which a client seeks access to documents or other tangible things created or amassed by his attorney during the course of the representation." (Citation and punctuation omitted.) *Swift, Currie, McGhee & Hiers v. Henry*, 276 Ga. 571, 573-574 (581 SE2d 37) (2003). Our holding in *Swift, Currie* rested on the rationale that the client, not the attorney, is the true "owner" of the client's file. Id. Nothing in this opinion should be construed as an abrogation of our holding in that case.

However, once the relationship between the attorney and client develops into an adversarial one, we believe that work product protection will attach under the same principles as discussed with respect to the attorney-client privilege. That is, once an attorney-client relationship has been established between firm in-house counsel and the firm for purposes of defending against perceived or actual legal action by the firm's outside client, the materials generated by in-house counsel in connection with those efforts should enjoy work product protection vis-á-vis the outside client just as in any other context. See *Garvy v. Seyfarth Shaw*, 966 NE2d at 539 (extending work product protection to in-house counsel's materials prepared in course of legal malpractice action brought by firm client).

In light of the above, the judgment of the Court of Appeals is hereby vacated and the case remanded for further proceedings not inconsistent with this opinion.

*Judgment vacated and case remanded with direction. All the Justices concur.*

DECIDED JULY 11, 2013.

*Weissman, Nowack, Curry & Wilco, John G. Nelson*, for appellant.

*Edenfield, Cox, Bruce & Classens, Susan W. Cox, Benjamin J. Colson*, for appellee.

*Baker, Donelson, Bearman, Caldwell & Berkowitz, Linda A. Klein, McKenna, Long & Aldridge, J. Randolph Evans, Shari L. Klevens, P. Michael Freed, Dow Lohnes, Stacey A. Carroll, Peter D. Coffman, Laurel G. Bellows, Harry H. Harkins, Jr.*, amici curiae.