295 Ga. 136
FINAL COPY

S13G1626.  HODGE et al. v. URFA-SEXTON, LP et al.

HUNSTEIN, Justice.

We granted certiorari in this case to determine whether the Court of Appeals correctly held that a conflict of interest involving a nonlawyer can be remedied by implementing proper screening measures in order to avoid disqualification of the entire law firm.  For the reasons set forth below, we hold that a nonlawyer's conflict of interest can be remedied by implementing proper screening measures so as to avoid disqualification of an entire law firm.  In this particular case, we find that the screening measures implemented by the nonlawyer's new law firm were effective and appropriate to protect against the nonlawyer's disclosure of confidential information.  However, we remand this case for the trial court to hold a hearing to determine whether the new law firm promptly disclosed the conflict.

On January 3, 2010, Monica Renee Williams was shot and killed at an apartment complex managed by Appellees URFA-Sexton, LP and Signature Management Corporation (hereinafter "URFA-Sexton").  Appellant Belinda

Ann Hodge is the sister of Williams. Kristi Bussey had known Hodge for approximately ten years prior to Williams' death.[1] Bussey assisted Hodge in obtaining her appointment as administratrix of Williams' estate and Hodge's appointment as the legal guardian for Williams' son.

Hodge retained attorney Craig Brookes of the law firm Hanks Brookes, LLC to pursue claims associated with the death of Williams. Bussey was a paralegal at Hanks Brookes and had worked there in that capacity since January 2007. Bussey was Hodge's primary contact with Hanks Brookes while she was employed at the firm. Bussey assisted with, and personally conducted, much of the investigation regarding Williams' death and the apartment complex where the death occurred. Bussey communicated regularly with Hodge about Hanks Brookes' investigation of the case, counsel's thoughts about the case, legal work being performed, and strategy for moving forward. Bussey participated in every face-to-face meeting Hodge had with Brookes while Bussey was employed with Hanks Brookes. Brookes spoke directly to Bussey about the status of her investigation, the results of his own investigation, his thoughts about the case,

_____

[1]At the time of Williams' death, Bussey was a roommate of one of Hodge's cousins. Bussey was also personal friends with Williams and her son.

2

the strategies to be employed, and pertinent legal and factual considerations in the case.

Meanwhile, on March 29, 2010, URFA-Sexton's insurer, Scottsdale Insurance Company, retained the firm of Insley & Race, LLC to represent URFA-Sexton in the Williams matter. For the next six months, Insley & Race conducted a pre-suit investigation and evaluation of the incident, including numerous interviews, review of documents, and a detailed assessment.

In October 2010, Bussey left her position as a paralegal with Hanks Brookes and began working as a legal assistant at another law firm. In early 2011, Bussey applied for a paralegal position at Insley & Race. Brynda Rodriguez Insley personally called, and obtained a reference from, J.R. Hanks at Hanks Brookes. Hanks never disclosed any possible conflict with regard to Bussey or Hanks Brookes' work on the Williams case. Hanks was unaware that URFA-Sexton was represented by Insley & Race in the Williams case.

Bussey began work as a paralegal at Insley & Race on March 15, 2011. At this time, neither Bussey nor Insley & Race was aware of any potential conflict regarding Bussey's work at Hanks Brookes, and Bussey did not know that Insley & Race was involved in a pre-suit investigation of Williams' death.

3

Accordingly, Insley & Race did not employ any screening measures at that time.

On October 5, 2011, Bussey became aware of Insley & Race's involvement in the Williams case. Bussey immediately informed Insley & Race of her work with Hanks Brookes on the Williams case. Insley & Race immediately implemented screening measures, discussed more fully below, to protect against Bussey's disclosure of confidential information she had gained from working on the Williams case at Hanks Brookes.

Later that same evening, Insley sent an email to Brookes and other counsel for Hodge advising of the firm's representation of URFA-Sexton and acknowledging the receipt of Hodge's demand letter. Insley did not mention any potential conflict involving Bussey.

On November 7, 2011, Hodge filed a complaint against URFA-Sexton, and Insley & Race subsequently filed an answer on behalf of URFA-Sexton. On December 6, 2011, counsel at Insley & Race disclosed Bussey's employment to Hodge's counsel. Hodge filed a motion to disqualify Insley & Race, requesting that Insley & Race voluntarily withdraw, and in the alternative, that the trial court issue an order disqualifying the firm from representing URFA-Sexton in the Williams matter. URFA-Sexton responded to Hodge's motion stating that

4

Insley & Race was its counsel of choice and that it would not voluntarily withdraw.

The trial court denied Hodge's motion, finding that Insley & Race was URFA-Sexton's counsel of choice, had developed specialized knowledge by working on the case for 18 months before learning of any potential conflict of interest, and had implemented appropriate and effective screening measures to protect against any disclosure of confidential information between Bussey and Insley & Race. Pursuant to Hodge's request, the trial court certified its order denying the motion to disqualify for immediate review. The Court of Appeals affirmed, finding that the trial court did not abuse its discretion in denying the motion to disqualify. Hodge v. URFA-Sexton, LP, 322 Ga. App. 534 (746 SE2d 142) (2013). We subsequently granted certiorari.

1. We review the trial court's ruling on a motion to disqualify for an abuse of discretion. Cardinal Robotics, Inc. v. Moody, 287 Ga. 18, 22 (694 SE2d 346) (2010). We approach motions to disqualify with caution due to the consequences that could result if the motion is granted, such as the inevitable delay of the proceedings and the unique hardship on the client including the loss of time, money, choice of counsel, and specialized knowledge of the disqualified

5

attorney.  See Bernocchi v. Forcucci, 279 Ga. 460 (2) (614 SE2d 775) (2005).

Additionally, we are mindful of counsel using motions to disqualify as a dilatory

tactic.  See Lewis v. State, 312 Ga. App. 275, 282 (718 SE2d 112) (2011).

Accordingly, we view disqualification as an extraordinary remedy that should

be granted sparingly. Bernocchi, 279 Ga. at 462.

It is well established that an attorney has a professional obligation to

maintain client confidences and secrets.  Ga. Rules of Professional Conduct,

Rule 1.6 (a).[2]  To protect this attorney-client relationship, the Georgia Rules of

Professional Conduct provide that a "lawyer who has formerly represented a

client in a matter shall not thereafter represent another person in the same or a

substantially related matter in which that person's interests are materially

adverse to the interests of the former client unless the former client gives

informed consent, confirmed in writing."  Rule 1.9 (a).  "When a lawyer has

---

[2]Rule 1.6 (a) provides as follows:

A lawyer shall maintain in confidence all information gained in the professional relationship with a client, including information which the client has requested to be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client, unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, or are required by these Rules or other law, or by order of the Court.

been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited." Id., Comment [2]. This Rule aims to protect former clients, avoid the appearance of any impropriety, and maintain public confidence in the integrity of our adversarial system. Registe v. State, 287 Ga. 542 (3) (c) (697 SE2d 804) (2010); Crawford W. Long Mem. Hosp. of Emory Univ. v. Yerby, 258 Ga. 720 (1) (373 SE2d 749) (1988); Rule 1.9, Comment [9].

Pursuant to Rule 1.10 (a), "'if one attorney in a firm has an actual conflict of interest, we impute that conflict to all the attorneys in the firm, subjecting the entire firm to disqualification.'" Rescigno v. Vesali, 306 Ga. App. 610, 612 (1) (703 SE2d 65) (2010).[3] This Rule aims to give effect to the principle of loyalty to the client. Rule 1.10, Comment [6]. "Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom

---

[3]Rule 1.10 (a) states that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7: Conflict of Interest: General Rule, 1.8(c): Conflict of Interest: Prohibited Transactions, 1.9: Former Client or 2.2: Intermediary."

7

the lawyer is associated." Id.

Nonlawyers are also privy to confidential client information because it is often necessary for them to have access to this information to assist their attorney employers. However, our Rules do not regulate nonlawyers. Thus, the question presented here is how to protect the client's confidences, avoid impropriety, and maintain public confidence in the integrity of our adversarial system when nonlawyers change firms to work for opposing counsel.

There is a split of authority among the courts on this issue. The minority approach, which is what Hodge argues we should apply here, is to treat nonlawyers the same way we treat lawyers. Under this approach, when a nonlawyer moves to another firm to work for opposing counsel, the nonlawyer's conflict of interest is imputed to the rest of the firm, thereby disqualifying opposing counsel. See, e.g., Owens v. First Family Fin. Svcs., Inc., 379 FSupp.2d 840 (III) (S.D. Miss. 2005); Zimmerman v. Mahaska Bottling Co., 19 P3d 784 (Kan. 2001); T.S.L. v. G.L., 976 So2d 793 (La. Ct. App. 2007). URFA-Sexton argues that we should adopt the majority approach and treat nonlawyers differently from lawyers. Under this approach, rather than automatic imputation and disqualification of the new firm, lawyers hiring the

8

nonlawyer can implement screening measures to protect any client confidences that the nonlawyer gained from prior employment. See, e.g., In re Columbia Valley Healthcare System, L.P., 320 SW3d 819 (II)-(III) (Tex. 2010); Leibowitz v. Eighth Judicial Dist. Court of Nev., 78 P3d 515, 521 (Nev. 2003); Green v. Toledo Hosp., 764 NE2d 979 (I) (Ohio 2002); Hayes v. Central States Orthopedic Specialists, Inc., 51 P3d 562 (II) (Okla. 2002); Phoenix Founders, Inc. v. Marshall, 887 SW2d 831, 835 (Tex. 1994); In re Complex Asbestos Litigation, 232 Cal.App.3d 572, 592-596 (1991); Restatement (Third) of the Law Governing Lawyers § 123, Comment (f) (2000); Cecile C. Edwards, *Law Firm Disqualification and Nonlawyer Employees: A Proposal for a Consistent Analysis*, 26 MISS. C. L. REV. 163 (V) (2007); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 88-1526 (1988). After reviewing both approaches, we join today with "the majority of professional legal ethics commentators, ethics tribunals, and courts[, which] have concluded that nonlawyer screening is a permissible method to protect confidences held by nonlawyer employees who change employment." Leibowitz, 78 P3d at 520.

We believe that screening measures are appropriate for nonlawyers, rather than imputed disqualification, for several reasons. First, nonlawyers generally

have neither a financial interest in the outcome of a particular litigation nor a choice about which clients they serve, which reduces the appearance of impropriety. See Hayes, 51 P3d at 567. Second, nonlawyers have different training, responsibilities, and discovery and use of confidential information compared to lawyers. In re Complex Asbestos Litigation, 232 Cal.App.3d at 593. Third, as noted above, disqualification of the new firm would present a hardship to the new firm's client, such as delays, further expenses, and a loss of specialized knowledge. Bernocchi, 279 Ga. at 462; see also In re Columbia Valley Healthcare System, L.P., 320 SW3d at 825.

Fourth, if imputation and disqualification were automatic, nonlawyers' employment mobility could be "unduly restricted." In re Columbia Valley Healthcare System, L.P., 320 SW3d at 825. In recommending that screening measures be allowed for nonlawyers, the ABA Committee on Ethics and Professional Responsibility recognized that it was important for nonlawyers to "have as much mobility in employment opportunity as possible consistent with the protection of clients' interests." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 88-1526, at 2. The ABA Committee noted that clients as well as the legal profession would be harmed by limiting nonlawyers'

employment opportunities and requiring them to leave the careers for which they are trained. Id.[4] "A potential employer might well be reluctant to hire a particular nonlawyer if doing so would automatically disqualify the entire firm from ongoing litigation." Phoenix Founders, Inc., 887 SW2d at 835. Nonlawyers in sparsely populated towns or counties as well as nonlawyers previously employed by massive firms and involved in extensive litigation would be especially hard hit by the rule of imputed disqualification. See Green, 764 NE2d at 983; Phoenix Founders, Inc., 887 SW2d at 835. "[A] lawyer may always practice his or her profession regardless of an affiliation to a law firm. Paralegals, legal secretaries, and other employees of attorneys do not have that option." Leibowitz, 78 P3d at 521. If we were to impute the nonlawyers conflict of interest to the entire firm, "employers could protect themselves against unanticipated disqualification risks only by refusing to hire experienced people." Restatement (Third) of the Law Governing Lawyers § 123, Comment (f) (2000).

---

[4]The ABA has since incorporated the Informal Opinion into its rules. See ABA Model Rules of Professional Conduct, Rule 1.10, Comment [4] (allowing screening measures rather than disqualification for nonattorneys when they have a conflict of interest).

11

Fifth, our Rules recognize that screening is effective at protecting a client's confidences. Our Rules explicitly allow screening with regard to lawyers who are former judges and arbitrators or former public officers and employees. Rules 1.11, 1.12.[5] The purpose of screening measures in Rules 1.11

---

[5]Rule 1.11 provides:

(a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government entity gives informed consent, confirmed in writing. No lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is duly given to the client and to the appropriate government entity to enable it to ascertain compliance with the provisions of this Rule.

(b) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.

Rule 1.12 states as follows:

(a) [A] lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer, arbitrator or law clerk to such

12

and 1.12 is "to assure the affected parties that confidential information known by the personally disqualified lawyer remains protected." Rule 1.0, Comment [9]. The use of a screen for nonlawyers has the same purpose.

Finally, while our Rules do not regulate nonlawyers, they do regulate attorneys' conduct with regard to supervising nonattorneys. Our Rules require that (1) a lawyer who has supervisory authority over a nonlawyer must make reasonable efforts to ensure that the nonlawyer's conduct is compatible with the professional obligations of a lawyer; (2) a lawyer may not order or ratify a nonlawyer's conduct if it would violate the Rules; and (3) those with managerial authority over a nonlawyer must make reasonable efforts to ensure that the firm itself has measures in place to give reasonable assurance that the nonlawyer's conduct is compatible with the professional obligations of the lawyer. Rule 5.3

---

a person, unless all parties to the proceeding give informed consent, confirmed in writing.
. . .
(c) If a lawyer is disqualified by paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in the matter unless:
(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and
(2) written notice is promptly given to the appropriate tribunal to enable it to ascertain compliance with the provisions of this Rule.

(a), (b), (c).[6]  These professional obligations include protecting a client's confidences.  See Rule 1.6 (a).  Thus, our Rules require that attorneys be held accountable for their nonlawyer employees' conduct, particularly where there is a threat to attorney-client confidentiality and the integrity of our judicial process. See In re Columbia Valley Healthcare System, L.P., 320 SW3d at 827; In re Complex Asbestos Litigation, 232 Cal.App.3d at 594, 603; ABA Comm. on Ethics and Professional Responsibility, Informal Op. 88-1526, at 2.  We are

[6]Rule 5.3 states as follows:
With respect to a nonlawyer employed or retained by or associated with a lawyer:
(a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;
(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Georgia Rules of Professional Conduct if engaged in by a lawyer if:
(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action[.]
. . .

14

not suggesting that lawyers always have a duty to an opposing party to maintain that party's confidences in the absence of a prior attorney-client relationship. However, we are mindful that the former employee's attorney has no effective means of protecting against the nonlawyer's disclosure of the client's confidences once the nonlawyer leaves the attorney's employment. Therefore, the responsibility for protecting the confidentiality of attorney-client communications must fall to the new lawyer or firm hiring the nonlawyer and the implementation of screening measures. See In re Complex Asbestos Litigation, 232 Cal.App.3d at 588.

Accordingly, as a matter of first impression, we set forth the following guidance for disqualification of a law firm based on a nonlawyer's conflict of interest. Once the new firm knows of the nonlawyer's conflict of interest, the new firm must give prompt written notice to any affected adversarial party or their counsel, stating the conflict and the screening measures utilized. See Leibowitz, 78 P3d at 521; cf. Rule 1.11 (a) (2) (regarding successive government and private employment, requiring that "written notice is duly given to the client and to the appropriate government entity"); Rule 1.12 (c) (2) (regarding former judge or arbitrator, requiring that "written notice is promptly

15

given to the appropriate tribunal"). The adversarial party may give written consent to the new firm's continued representation of its client with screening measures in place.

Absent written consent, the adversarial party may move to disqualify the new firm. The adversarial party must show that the nonlawyer actually worked on a same or substantially related matter involving the adversarial party while the nonlawyer was employed at the former firm.[7] If the moving party can show this, it will be presumed that the nonlawyer learned confidential information about the matter. See Phoenix Founders, Inc., 887 SW2d at 834. This prevents the nonlawyer from having to disclose the very information that should be protected. See id.; In re Complex Asbestos Litigation, 232 Cal.App.3d at 597.

Once this showing has been made, a rebuttable presumption arises that the

---

[7]We express no opinion on cases, unlike here, where the nonlawyer has not worked on a matter involving the adversarial party at the previous firm. In these instances, a proposed suggestion is to ask whether the nonlawyer was exposed to confidential matter. See Green, 764 NE2d at 983; Edwards, 26 MISS. C. L. REV. at 179. This then would create a rebuttable presumption for the new firm to show that there was no access or exposure to confidential information by the nonlawyer at the previous firm. See Green, 764 NE2d at 983; Edwards, 26 MISS. C. L. REV. at 179.

nonlawyer has used or disclosed, or will use or disclose, the confidential information to the new firm. See Phoenix Founders, Inc., 887 SW2d at 834-835. The new firm may rebut this by showing that it has properly taken effective screening measures to protect against the nonlawyer's disclosure of the former client's confidential information. See id. at 835; see also Green, 764 NE2d at 983; Hayes, 51 P3d at 569. If the new firm can sufficiently rebut the presumption and show that it promptly gave written notice of the nonlawyer's conflict, then disqualification is not required.

The specific screening measures that the new firm must implement will vary based on the particular circumstances in each case. See Rule 1.0, Comment [9] ("screening measures that are appropriate for the particular matter will depend on the circumstances"). Courts must evaluate whether the new firm took sufficient measures to reduce the potential for the breach of confidences by the nonlawyer. Courts may also consider the amount of time that has elapsed since the nonlawyer's work on the case in question at the previous firm, the size of the new and previous firms, and the number of individuals presumed to have confidential information. See In re Columbia Valley Healthcare System, L.P., 320 SW3d at 824-825.

At a minimum,

> [a] lawyer should give [nonlawyers] appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client, and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

Rule 5.3, Comment [1]. A lawyer should "screen" the nonlawyer, which our Rules define as isolating the nonlawyer "from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated [non]lawyer is obligated to protect under these Rules or other law." Rule 1.0 (p).

> The personally disqualified [nonlawyer] should acknowledge the obligation not to communicate with any of the other lawyers in the firm with respect to the matter [and] other lawyers in the firm who are working on the matter should be informed that the screening is in place and that they may not communicate with the personally disqualified [nonlawyer] with respect to the matter.

Rule 1.0, Comment [9]. It may also be appropriate for the firm to institute procedures to prevent the nonlawyer from having contact with, or access to, any firm files or other materials relating to the matter. Id. It may also be prudent for

the firm to present periodic reminders of the screen to the nonlawyer and all other firm personnel. Id. "In order to be effective, screening measures must be implemented as soon as practical after a [nonlawyer,] lawyer[,] or law firm knows or reasonably should know that there is a need for screening." Id. at Comment [10].

On the other hand, the new firm will be disqualified where (1) the nonlawyer has already revealed the confidential information to lawyers or other personnel in the new firm; (2) screening would be ineffective; or (3) "the nonlawyer necessarily would be required to work [or has actually worked at the new firm] on the other side of the same or a substantially related matter on which the nonlawyer [previously] worked." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 88-1526, at 2; see also Leibowitz, 78 P3d at 522; Phoenix Founders, Inc., 887 SW2d at 835. If these situations occur, the new firm must withdraw from representing its client because the confidentiality of the former client has been destroyed and the appearance of impropriety will result.

2. Having found that screening is appropriate for nonlawyers, we must now evaluate the measures used by Insley & Race in this particular case. First,

19

we begin by noting that Hodge has not waived the conflict of interest by giving written consent for Insley & Race to continue to represent URFA-Sexton, and URFA-Sexton has expressly requested that Insley & Race continue to represent it as their counsel of choice. Additionally, Bussey attests in her affidavit that she has neither discussed nor disclosed any confidential information that she obtained about the Williams matter during her employment with Hanks Brookes to any person at Insley & Race, and Bussey has not worked on the Williams case while at Insley & Race. Accordingly, automatic disqualification is not warranted.

Next, there is no dispute that Bussey worked on the Williams case while at Hanks Brookes, and therefore, it is presumed that Bussey learned confidential information about the Williams case. The burden now shifts to Insley & Race to rebut the presumption that Bussey used or disclosed, or will use or will disclose, confidential information about the Williams case to Insley & Race.

Bussey states in her affidavit that she was unaware of Insley & Race's involvement in the Williams case when she was hired on March 15, 2011, and Insley attests that the firm was unaware of any potential conflict in hiring Bussey. Bussey states that she did not learn of her new firm's involvement in

20

the Williams case until October 5, 2011. Upon discovering that Insley & Race was counsel for URFA-Sexton, Bussey immediately informed her co-workers, Insley, and the firm administrator. Insley immediately instructed Bussey not to be involved in the Williams case at Insley & Race in any way or to have any discussions with anyone about the case or her knowledge about it. Furthermore, Insley instructed Bussey that she would be restricted from any access to the electronic file and that Insley would make sure that appropriate screening measures were in place at Insley & Race. The firm administrator immediately implemented and confirmed electronic screening measures with Bussey, including taking steps to restrict Bussey's access to any information about the Williams case, implementing security measures to prevent Bussey from accessing any computerized information maintained by Insley & Race regarding the Williams case, and testing the security measures he implemented to ensure their success. Since October 5, Bussey has been unable to access the case management system used by Insley & Race for the Williams matter, including any calendar events, contact information, documents, and billing information for the Williams case. Additionally, the physical file was removed from the general file room and securely placed in the office of an associate.

Bussey and Insley state in their affidavits that Bussey will continue to fully abide by the screening and restrictive measures implemented at Insley & Race; Bussey will not have access to the electronic or physical file in the Williams case; and Bussey will not discuss or disclose any confidential information about the Williams case to anyone at Insley & Race. Insley as well as the firm administrator attest that the screening and restrictive measures implemented on October 5, 2011, have and will remain in place throughout the duration of the case to prevent the disclosure of confidential information.

We find that in this particular case Insley & Race's screening measures were, and are, appropriate and effective to protect against Bussey's disclosure of confidential information she learned while working on the Williams case at Hanks Brookes. Insley & Race took sufficient screening measures to reduce the potential for the breach of confidences by Bussey, and therefore, Insley & Race has rebutted the presumption that Bussey used or disclosed, or will use & disclose, the confidential information.

Hodge contends that Insley & Race should be disqualified because the firm did not perform adequate conflict checks to detect whether Bussey had worked on the Williams case. Insley & Race responds that Hanks Brookes

22

should have disclosed its involvement in the Williams case when Insley called Hanks to discuss hiring Bussey in March 2011. Although we agree that it would be prudent for a potential employer to conduct conflict checks before hiring a new nonlawyer, so as to implement appropriate screening measures and avoid the possibility of subsequent disqualification, in this case the potential conflict was missed, regardless of whether the blame rests with Insley & Race or Hanks Brookes. Importantly, Insley & Race implemented effective screening measures as soon as Bussey informed the firm of the conflict to ensure that Bussey would not disclose confidential information about the Williams case, and Bussey has not actually disclosed such confidential information.

Hodge also argues that Insley & Race did not timely disclose Bussey's conflict to Hanks Brookes on October 5, and instead waited until December 6 to do so. Hodge raised this argument before the trial court and the Court of Appeals, but neither court addressed this issue. Based on the guidelines we have established today, once Insley & Race knew of Bussey's conflict of interest, Insley & Race was required to give prompt written notice to Hodge or her counsel, stating the conflict and the screening measures implemented at Insley & Race. Therefore, we remand this case to the Court of Appeals to remand to

23

the trial court for a hearing to determine whether Insley & Race gave prompt written notice to Hodge or her counsel.

Judgment vacated and case remanded with direction. All the Justices concur.

NAHMIAS, Justice, concurring.

Last year this Court noted the difficulties that may be caused by applying the imputed conflict of interest rule, Rule 1.10 (a) of the Georgia Rules of Professional Responsibility found in State Bar Rule 4-102, to all of the lawyers working in a single circuit public defender office. See In re Formal Advisory Opinion 10-1, 293 Ga. 397, 400 (744 SE2d 798) (2013) ("FAO 10-1"). Yet we adhered to the plain text of Rule 1.10, noting that any alteration of the rule should come by amendment. See id. at 401, n. 4. See generally Rule 5-101 (describing the process for amending the Bar Rules). In another case decided last year, we avoided deciding what we called the "thorny ethical issues" posed by Rule 1.10 (a) when lawyers wish to consult with their law firm's in-house counsel about potential malpractice claims by a client of the firm. See St.

Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C., 293 Ga. 419, 425-426 & n.4. (746 SE2d 98) (2013). This time we "encourage[d] those interested in the resolution of these ethical issues to appeal to the State Bar for guidance on, clarification of, and possible amendments to our Rules of Professional Conduct."

The Court can take neither of those courses today. Unlike in the Hunter, Maclean case, we cannot avoid deciding the professional responsibility issue and leave it to the rule-making (or even to the formal advisory opinion) process to address, because that would take significant time and we need to decide the disqualification question that this case presents. And unlike in FAO 10-1, we cannot simply rely on the plain text of the rules, because the rules do not speak directly to whether a *nonlawyer*'s conflict of interest must be imputed to the entire law firm for which she works or rather may be addressed through effective screening measures. I therefore join the Court's opinion authorizing proper screening to prevent the imputation of conflicts as to nonlawyers in some cases, including this one. The Court's decision accords with the majority view of courts and commentators nationwide, reflects the fact that nonlawyers stand in a different position than lawyers for purposes of the Bar Rules, and is

25

consistent with the text of Rule 5.3, which requires lawyers with managerial or direct supervisory authority over nonlawyers to make "reasonable efforts" to ensure that the nonlawyers' conduct is *compatible* with — not necessarily identical to — the professional obligations of the lawyers. Compare Rule 5.1 (requiring lawyers with managerial or direct supervisory authority over other lawyers to make reasonable efforts to ensure that the lawyers *conform* to the Rules of Professional Conduct).

It should be noted, however, that this is yet another case that raises questions about whether Rule 1.10, and in particular its implicit rejection of the use of screening measures to avoid imputed disqualification of an entire law firm when one of their lawyers would be disqualified, should be reconsidered and amended or at least clarified. After all, the rules already allow the use of screening to avoid conflicts imputed from some lawyers — former government lawyers, judges, and arbitrators. See Rules 1.11 (a) and 1.12 (c). And many of the factors that the Court discusses in support of our conclusion that screening measures, rather than imputed disqualification, may be appropriate for nonlawyers also apply to many other lawyers — especially associates. In addition, we should acknowledge that, as in the rest of our economy, it is

becoming far less common for lawyers and their nonlawyer assistants to remain with the same firm for an entire career, whether by choice or due to layoffs or merger and dissolution of firms. This Court can continue deciding — or avoiding deciding — the impact of Rule 1.10 on a case-by-case basis, but the process for amending the Bar Rules provides opportunities for greater and broader input from those whose interests may be affected by imputed disqualification as well as consideration of facts and circumstances beyond those presented in the record of a particular case. That seems a preferable way to address these issues.

Decided May 5, 2014.

Certiorari to the Court of Appeals of Georgia – 322 Ga. App. 534.

Michael A. Mills, for appellants.

Insley & Race, Brynda R. Insley, James P. Myers, for appellees