**SECOND DIVISION**
**BROWN,**
**MARKLE and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 19, 2024**

# In the Court of Appeals of Georgia

A24A1595. ROMAN v. THE STATE.

A24A1596. SHAFER v. THE STATE.

A24A1597. CHEELEY v. THE STATE.

A24A1598. MEADOWS v. THE STATE.

A24A1599. TRUMP v. THE STATE.

A24A1600. LATHAM v. THE STATE.

A24A1601. GIULIANI v. THE STATE.

A24A1602. CLARK v. THE STATE.

A24A1603. FLOYD v. THE STATE.

BROWN, Judge.

Michael Roman, David Shafer, Robert Cheeley, Mark Meadows, Donald Trump, Cathleen Latham, Rudolph Giuliani, Jeffrey Clark, and Harrison Floyd (collectively "the appellants") were charged in a 97-page indictment with RICO violations and other crimes in connection with an alleged conspiracy to unlawfully change the outcome of the 2020 presidential election. Pursuant to a granted

interlocutory application, the appellants appeal from the trial court's order denying their motion to dismiss the indictment and granting, in part, their motions to disqualify the Atlanta Judicial Circuit District Attorney Fani Willis ("DA Willis") and her office. Collectively, the appellants assert numerous grounds to reverse the trial court's order, including that the trial court imposed an improper remedy after concluding that DA Willis' "prosecution" is encumbered by a "significant appearance of impropriety" not grounded on "mere status alone," but instead resulting from "specific conduct, [impacting] more than a mere 'nebulous' public interest because it concerns a public prosecutor." (Emphasis supplied.) In response, the State asks this Court to affirm the trial court's order in its totality, including the imposition of an alternative remedy requiring that either DA Willis, along with the whole of her office, step aside and refer the case to the Prosecuting Attorneys' Council for reassignment, or Special Assistant District Attorney Nathan Wade ("SADA Wade") withdraw from the case. Importantly, the State has not filed a cross-appeal asserting that the trial court's finding of this appearance of impropriety should be reversed. Accordingly, whether the evidence presented to the trial court adequately supported, under the appropriate standard of review on appeal, its finding of the

2

existence of an appearance of impropriety is *not* before this Court. Instead, we must determine whether the remedy fashioned by the trial court for this undisputed finding of a "significant" appearance of impropriety was improper as contended by the appellants. For the reasons explained below, we conclude that it was and therefore reverse the trial court's denial of the appellants' motion to disqualify. We affirm, however, the denial of the appellants' motion to dismiss the indictment.

*Motion to Disqualify in Special Grand Jury Proceeding.* On January 24, 2022, the Chief Judge of the Superior Court of Fulton County impaneled a special grand jury, at the request of DA Willis, "for the purpose of investigating the facts and circumstances relating . . . to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia[,]" including "the decision by the State Republican party officials to draft an alternate slate of Presidential electors. . . ." DA Willis served as the "legal advisor" to the special grand jury, which began receiving evidence in June of 2022. Around the same time, DA Willis hosted and headlined a fundraiser for an opposition candidate against Burt Jones in a lieutenant governor race. After she later publicly identified Jones as a "target" of the grand jury's investigation, he and eleven other alternate electors sought to disqualify DA Willis and her office

based upon an actual conflict of interest. The superior court overseeing the special grand jury proceeding disqualified DA Willis and her office from any further criminal investigation or prosecution of Jones based upon "a plain — and actual and untenable — conflict." It reasoned that

> concern about the District Attorney's partiality naturally, immediately, and reasonably arises in the minds of the public, the pundits, and — most critically — the subjects of the investigation that necessitates the disqualification. An investigation of this significance, garnering the public attention it necessarily does and touching so many political nerves in our society, cannot be burdened by legitimate doubts about the District Attorney's motives. The District Attorney does not have to be apolitical, but her investigations do.

The superior court denied the motion to disqualify filed by the remaining alternate electors because they failed to show an actual conflict of interest with DA Willis or any member of her prosecution team. Its order did not explicitly address the appearance of impropriety as a ground to disqualify. After the special grand jury issued its final report recommending criminal charges against the appellants (and others), it was dissolved on January 9, 2023.

*Motion to Disqualify Following Indictment.* On August 14, 2023, DA Willis secured the RICO indictment against the appellants (and ten others). On January 8, 2024, Roman filed a motion to dismiss the indictment and disqualify DA Willis, her office, and SADA Wade from further prosecuting this case on alleged grounds of conflict and an appearance of impropriety. Roman alleged a personal relationship between DA Willis and SADA Wade, along with an alleged personal financial interest in the case. After DA Willis spoke publicly in a church service on Sunday, January 14, 2024, the other appellants also filed motions seeking dismissal and disqualification on the same grounds, as well as the additional ground of forensic misconduct in connection with the church speech and various other extrajudicial statements.

*The Trial Court's Order.* On March 15, 2024, the trial court entered its order on the motions after conducting a multiple-day evidentiary hearing. It summarized the issues and its rulings as follows:

> As alleged, the claims presented a possible financial conflict of interest for the District Attorney. More importantly, the defense motion and the State's response created a conflict in the evidence that could only be resolved through an evidentiary hearing, and one that could not simply be ignored without endangering a criminally accused's constitutional right to procedural due process. After receiving two and

a half days of testimony, during which the Defendants were provided an opportunity to subpoena and introduce whatever relevant and material evidence they could muster,[1] the [c]ourt finds that the Defendants failed to meet their burden of proving that the District Attorney acquired an actual conflict of interest in this case through her personal relationship and recurring travels with her lead prosecutor. The other alleged grounds for disqualification, including forensic misconduct, are also denied. However, the established record now highlights a significant appearance of impropriety that infects the current structure of the prosecution team — an appearance that must be removed through the State's selection of one of two options. . . . The District Attorney may choose to step aside, along with the whole of her office, and refer the prosecution to the Prosecuting Attorneys' Council for reassignment. See OCGA § 15-18-5. Alternatively, SADA Wade can withdraw, allowing the District Attorney, the Defendants, and the public to move forward without his presence or remuneration distracting from and potentially compromising the merits of the case.

(Citation omitted.) The trial court made the following findings of fact in its order:

---

[1] The transcript reveals that the trial court precluded cross-examination of DA Willis about matters related to forensic misconduct, as well as county codes and ordinances. It appears that the trial court limited the evidence in the hearing to "the relationship and/or any financial elements of it" in an off-the-record ruling referenced in the transcript. The record before us contains no authenticated recording or transcript of the church speech, and it was never introduced into evidence at the hearing. The appellants do not assert on appeal that the trial court erred by limiting their cross-examination and introduction of evidence in the hearing.

On November 1, 2021, the District Attorney hired Nathan Wade to serve as a SADA and lead the investigation that produced the indictment in this case. The District Attorney considered at least one other option before hiring Wade, extending an offer to former Governor Roy Barnes, who declined. The contract allowed a $250 hourly rate — a relatively low amount by metro Atlanta standards for an attorney with Wade's years of service — and contained a ceiling on the maximum number of hours permitted. Under the terms of the first contract, Wade was not to perform more than 60 hours of work per month without written permission. No evidence introduced indicates that Wade ever received permission to exceed these monthly hourly caps. His contract was renewed on November 15, 2022, and again on June 12, 2023.

Between October 2022 and May 2023, the District Attorney and Wade traveled together on four occasions that resulted in documentable expenses. The first included an extended trip in October 2022 to Miami and Aruba and a cruise. Wade initially covered expenses for the October 2022 trip totaling approximately $5,223. In December 2022, the two flew to Miami for another cruise for which the District Attorney paid $1,394 for plane tickets, while Wade purchased passage for the cruise along with other vacation-related expenses totaling approximately $3,684. In March 2023, the two traveled to Belize, where Wade covered resort and restaurant expenses in the amount of approximately $3,000. In May 2023, they traveled to Napa Valley, where Wade covered airfare, lodging, and Uber rides in the amount of around $2,829. In addition, the two described taking a number of day-long road trips to Tennessee,

Alabama, South Carolina, North Carolina, and other parts of Georgia. They also admitted to dining out on multiple occasions and taking turns covering the bill. With seemingly full access to Wade's primary credit card statements, the Defendants did not produce evidence of any further documentable expenses or gifts, nor were any revealed through the testimony. In total, Defendants point to an aggregate documented benefit of, at most, approximately $12,000 to $15,000 in the District Attorney's favor.

The District Attorney and Wade testified that these expenditures were not meant as gifts and not designed to benefit the District Attorney. Both testified that the District Attorney regularly reimbursed Wade in cash. And if not reimbursed, the District Attorney covered a comparable, related expense. For example, the District Attorney testified that she reimbursed Wade in cash for the Aruba trip which she estimated cost around $2,000 and that she "gave him money" for both cruises. She further claimed that she reimbursed Wade for the entirety of the Belize trip and that she paid for the Napa Valley excursions. Finally, while Wade could have bought meals in 2020 which totaled more than $100, she would also regularly pay for his meals.

Such a reimbursement practice may be unusual and the lack of any documentary corroboration understandably concerning. Yet the testimony withstood direct contradiction, was corroborated by other evidence (for example, her payment of airfare for two on the 2022 Miami trip), and was not so incredible as to be inherently unbelievable.

However, as the District Attorney herself acknowledged, no ledger exists. Other than a "best guesstimate," there is no way to be certain that expenses were split completely evenly — and the District Attorney may well have received a net benefit of several hundred dollars. Despite this, after considering all the surrounding circumstances, the [c]ourt finds that the evidence did not establish the District Attorney's receipt of a material financial benefit as a result of her decision to hire and engage in a romantic relationship with Wade. Simply put, the Defendants have not presented sufficient evidence indicating that the expenses were not "roughly divided evenly," or that the District Attorney was, or currently remains, "greatly and pecuniarily interested" in this prosecution.

In addition — and much more important — the [c]ourt finds, based largely on the District Attorney's testimony, that the evidence demonstrated that the financial gain flowing from her relationship with Wade was not a motivating factor on the part of the District Attorney to indict and prosecute this case. While a general motive for more income can never be disregarded entirely, the District Attorney was not financially destitute throughout this time or in any great need, as she testified that her salary exceeds $200,000 per year without any indication of excessive expenses or debts. Similarly, the [c]ourt further finds that the Defendants have failed to demonstrate that the District Attorney's conduct has impacted or influenced the case to the Defendants' detriment. While prejudice is not a required element for disqualification, it is relevant to considerations of due process and the Defendants' requested remedy of complete dismissal.

Defendants argue that the financial arrangement created an incentive to prolong the case, but in fact, there is no indication the District Attorney is interested in delaying anything. Indeed, the record is quite to the contrary. Before the relationship came to light, the State requested that trial begin less than six months after indictment. Soon thereafter, the State opposed severance of the objecting defendants who did not demand their statutory right to a speedy trial. The State argued that it only wanted to try the case once (assuming that such a trial would have been affirmed after any necessary post-conviction appeals). The State amended its proposed timeline in November 2023 to request that the trial commence less than one year after the return of the indictment. And even before indictment, the District Attorney approved a Grand Jury presentment that included fewer defendants than the Special Purpose Grand Jury recommended. In sum, the District Attorney has not in any way acted in conformance with the theory that she arranged a financial scheme to enrich herself (or endear herself to Wade) by extending the duration of this prosecution or engaging in excessive litigation.

Without sufficient evidence that the District Attorney acquired a personal stake in the prosecution, or that her financial arrangements had any impact on the case, the Defendants' claims of an actual conflict must be denied. This finding is by no means an indication that the [c]ourt condones this tremendous lapse in judgment or the unprofessional manner of the District Attorney's testimony during the evidentiary hearing. Rather, it is the undersigned's opinion that Georgia law does not

permit the finding of an actual conflict for simply making bad choices —
even repeatedly — and it is the trial court's duty to confine itself to the
relevant issues and applicable law properly brought before it.

(Citations omitted.) Although the trial court found "insufficient evidence of an actual
conflict of interest[,]" it also concluded that

> the record made at the evidentiary hearing established that the District
> Attorney's prosecution is encumbered by an appearance of impropriety.
> This appearance is not created by mere status alone, but comes because
> of specific conduct, and impacts more than a mere "nebulous" public
> interest because it concerns a public prosecutor. Even if the romantic
> relationship began after SADA Wade's initial contract in November
> 2021, the District Attorney chose to continue supervising and paying
> Wade while maintaining such a relationship. She further allowed the
> regular and loose exchange of money between them without any exact or
> verifiable measure of reconciliation. This lack of a confirmed financial
> split creates the possibility and appearance that the District Attorney
> benefitted — albeit non-materially — from a contract whose award lay
> solely within her purview and policing.
>
> Most importantly, were the case allowed to proceed unchanged,
> the *prima facie* concerns raised by the Defendants would persist. As the
> District Attorney testified, her relationship with Wade has only
> "cemented" after these motions and "is stronger than ever." Wade's
> patently unpersuasive explanation for the inaccurate interrogatories he

11

submitted in his pending divorce indicates a willingness on his part to wrongly conceal his relationship with the District Attorney. As the case moves forward, reasonable members of the public could easily be left to wonder whether the financial exchanges have continued resulting in some form of benefit to the District Attorney, or even whether the romantic relationship has resumed.[2] Put differently, an outsider could reasonably think that the District Attorney is not exercising her independent professional judgment totally free of any compromising influences. As long as Wade remains on the case, this unnecessary perception will persist.

The testimony introduced, including that of the District Attorney and Wade, did not put these concerns to rest. During argument, the Defendants' focus largely pivoted from the financial concerns to disproving the testimony of the District Attorney, namely that her romantic relationship actually predated the November 2021 hiring of Wade. On that front, the [c]ourt makes a few brief observations. First, the [c]ourt finds itself unable to place any stock in the testimony of Terrence Bradley. His inconsistencies, demeanor, and generally non-responsive answers left far too brittle a foundation upon which to build any conclusions. While prior inconsistent statements can be considered as substantive evidence under Georgia law, Bradley's impeachment by text message did not establish the basis for which he claimed such sweeping knowledge of Wade's personal affairs. In addition, while the

---

[2] DA Willis and SADA Wade testified that their personal relationship ended sometime in the summer of 2023.

testimony of Robin Yearti raised doubts about the State's assertions, it ultimately lacked context and detail. Even after considering the proffered cell phone testimony from Defendant Trump, along with the entirety of the other evidence, neither side was able to conclusively establish by a preponderance of the evidence when the relationship evolved into a romantic one.

However, an odor of mendacity[3] remains. The [c]ourt is not under an obligation to ferret out every instance of potential dishonesty from each witness or defendant ever presented in open court. . . . Yet reasonable questions about whether the District Attorney and her hand-selected lead SADA testified untruthfully about the timing of their relationship further underpin the finding of an appearance of impropriety and the need to make proportional efforts to cure it.

(Citation, footnote, and emphasis omitted.)

It then rejected dismissal of the indictment and disqualification of DA Willis and her office based upon the following reasoning:

Ultimately, dismissal of the indictment is not the appropriate remedy to adequately dissipate the financial cloud of impropriety and potential untruthfulness found here. There has not been a showing that the Defendants' due process rights have been violated or that the issues

---

[3] Mendacity means "untruthfulness" or "tendency to lie." See Webster's Encyclopedic Unabridged Dictionary of the English Language.

involved prejudiced the Defendants in any way. Nor is disqualification of a constitutional officer necessary when a less drastic and sufficiently remedial option is available[, i.e., the District Attorney's selection of whether Wade would withdraw or she would refer the case to the Prosecuting Attorneys' Council for reassignment].

1. The appellants contend that the trial court's failure to disqualify DA Willis and her office was erroneous in light of the trial court's finding that the record established that the "prosecution" is encumbered by "a significant appearance of impropriety." In the appellants' view, the trial court's forward-looking remedy did not cure the already existing appearance of impropriety and the "odor of mendacity" found by the trial court. Based upon the fact findings of the trial court in its order and the State's failure to cross-appeal the trial court's finding of a "significant" appearance of impropriety, we agree.

As our consideration of the appearance of impropriety is limited to the remedy fashioned by the trial court, we turn to Georgia law on this issue. While the parties advocate for diametrically opposed bright-line rules — disqualification of the district attorney's office can never result from an appearance of impropriety or disqualification should always result when the elected district attorney engages in

activities that raise the appearance of impropriety — Georgia law requires neither as a matter of course. Instead, we must examine the particular facts and circumstances of each case while keeping some general principles in mind. First, the trial court's ruling on a motion to disqualify is reviewed for an abuse of discretion. See *Neuman v. State*, 311 Ga. 83, 88 (3) (856 SE2d 289) (2021). Second, the issue of attorney disqualification is viewed as a continuum. See *Blumenfeld v. Borenstein*, 247 Ga. 406, 409 (276 SE2d 607) (1981).

> At one end of the scale where disqualification is always justified and indeed mandated, even when balanced against a client's right to an attorney of choice, is the appearance of impropriety coupled with a conflict of interest or jeopardy to a client's confidences. In these instances, it is clear that the disqualification is necessary for the protection of the client. Somewhere in the middle of the continuum is the appearance of impropriety based on conduct on the part of the attorney. As discussed above, this generally has been found insufficient to outweigh the client's interest in counsel of choice. This is probably so because absent danger to the client, the nebulous interest of the public at large in the propriety of the Bar is not weighty enough to justify disqualification. Finally, at the opposite end of the continuum is the appearance of impropriety based not on conduct but on status alone. This is an insufficient ground for disqualification.

Id. at 409-410. See also *Battle v. State*, 301 Ga. 694, 698 (3) (804 SE2d 46) (2017) (stating that the appearance of impropriety may be grounds for disqualification of a prosecutor) .

Here, we must address the remedy in the context of a significant appearance of impropriety caused by the conduct of a public prosecutor.

> In our criminal justice system, the district attorney represents the people of the state in prosecuting individuals who have been charged with violating our state's criminal laws. The responsibility of a public prosecutor differs from that of the usual advocate; [her] duty is to seek justice, not merely to convict. This special duty exists because the prosecutor represents the sovereign and should exercise restraint in the discretionary exercise of governmental powers. Therefore, the district attorney is more than an advocate for one party and has additional professional responsibilities as a public prosecutor to make decisions in the public's interest. In the district attorney's role as an administrator of justice, he or she has broad discretion in making decisions prior to trial about who to prosecute, what charges to bring, and which sentence to seek.

(Citation and punctuation omitted.) *State v. Wooten*, 273 Ga. 529, 531 (2) (543 SE2d 721) (2001). These considerations take this case out of the continuum of cases involving an appearance of impropriety in connection with the conduct of private

16

counsel and a client's interest in counsel of choice balanced against a more nebulous public interest.

After carefully considering the trial court's findings in its order, we conclude that it erred by failing to disqualify DA Willis and her office. The remedy crafted by the trial court to prevent an ongoing appearance of impropriety did nothing to address the appearance of impropriety that existed at times when DA Willis was exercising her broad pretrial discretion about who to prosecute and what charges to bring. While we recognize that an appearance of impropriety generally is not enough to support disqualification, this is the rare case in which disqualification is mandated and no other remedy will suffice to restore public confidence in the integrity of these proceedings.[4]

---

[4] Our opinions in *Head v. State*, 253 Ga. App. 757 (560 SE2d 536) (2002), *Billings v. State*, 212 Ga. App. 125 (441 SE2d 262) (1994), and *Whitworth v. State*, 275 Ga. App. 790 (622 SE2d 21) (2005), are distinguishable. In *Head*, we addressed an appearance of impropriety based upon status alone where the investigator with the alleged status conflict took no part in the investigation or prosecution of the case. 253 Ga. App. at 758 (2). Similarly, in *Billings*, the assistant district attorney with the appearance of impropriety did not participate directly or indirectly in the prosecution of the case after joining the office of the district attorney. 212 Ga. App. at 365-266 (4). Here, on the other hand, DA Willis and SADA Wade have been actively involved in this case from its inception. Division 1 of our opinion in *Whitworth* is non-binding physical precedent, and the case addressed only the disqualification of a special assistant district attorney. 275 Ga. App. at 791-797 (1). Likewise, the Supreme Court of Georgia's opinion in *Frazier v. State*, 257 Ga. 690 (362 SE2d 351) (1987), relied upon by the trial court, is factually distinguishable and does not require a different

17

Accordingly, we reverse the trial court's denial of the appellants' motion to disqualify DA Willis and her office. As we conclude that the elected district attorney is wholly disqualified from this case, "the assistant district attorneys — whose only power to prosecute a case is derived from the constitutional authority of the district attorney who appointed them — have no authority to proceed." *McLaughlin v. Payne*, 295 Ga 609, 613 (761 SE2d 289) (2014) (distinguishing between absolute disqualification of elected district attorney and disqualification of elected district attorney from serving as an advocate at trial because he was appearing as a witness).

2. The appellants contend that the trial court erred in denying their motions to dismiss the indictment. The State responds that the appellants have failed to show that the trial court erred in finding that the appellants had not shown "that [their] due process rights have been violated or that the issues involved prejudiced [them] in any way."

"Dismissal of an indictment . . . [is] an extreme sanction[ ], used only sparingly . . . for unlawful government conduct." *State v. Lampl*, 296 Ga. 892, 896 (2) (770

---

result. The issue before the Supreme Court was the disqualification of the entire district attorney's office based upon an assistant district attorney's conflict of interest rather than the conduct of the elected district attorney. Id. at 693-694 (9).

18

SE2d 629) (2015). In the absence of express statutory authorization, dismissal of an indictment "generally cannot be imposed absent a violation of a constitutional right." (Citation and punctuation omitted.) Id. While this is the rare case in which DA Willis and her office must be disqualified due to a significant appearance of impropriety, we cannot conclude that the record also supports the imposition of the extreme sanction of dismissal of the indictment under the appropriate standard. See *Olsen v. State*, 302 Ga. 288, 293-294 (2) (806 SE2d 556) (2017); *Lamb v. State*, 267 Ga. 464, 465-466 (5) (479 SE2d 719) (1997). We therefore affirm the trial court's denial of the appellants' motion to dismiss.

3. The appellants' remaining enumerations of error are rendered moot by our holdings in Divisions 1 and 2.

*Judgment affirmed in part and reversed in part. Markle, J., concurs. Land, J., dissents.*

A24A1595.  ROMAN v. THE STATE; and associated cases.

LAND, Judge, dissenting.

Because the law does not support the result reached by the majority, I respectfully dissent. I am particularly troubled by the fact that the majority has taken what has long been a discretionary decision for the *trial court* to make and converted it to something else entirely. If this Court was the trier of fact and had the discretion to choose a remedy based on our own observations, assessment of the credibility of the witnesses, and weighing of the evidence, then perhaps we would be justified in reaching the result declared by the majority. But we are not trial judges, and we lack that authority. Given the unique role of the trial court and the fact that *it* is the court which has broad discretion to impose a remedy that fits the situation as it finds it to be, we should resist the temptation to interfere with that discretion, including its chosen remedy, just because we happen to see things differently. Doing otherwise

violates well-established precedent, threatens the discretion given to trial courts, and blurs the distinction between our respective courts.

Our role as appellate judges is critically important, but it often requires restraint. We are here to ensure the law has been applied correctly and to correct harmful legal errors when we see them. It is not our job to second-guess trial judges or to substitute our judgment for theirs. We do not find the facts but instead defer to the trial court's factual findings where there is any evidence to support them. "We review the trial court's ruling on a motion to disqualify a prosecutor for abuse of discretion. Such an exercise of discretion is based on the trial court's findings of fact which we must sustain if there is any evidence to support them." (Citations and punctuation omitted.) *Neuman v. State*, 311 Ga. 83, 88 (3) (856 SE2d 289) (2021).

Here, the trial court expressly found that appellants failed to show that the district attorney had an actual conflict of interest, failed to show that she received any material financial benefit as a result of her relationship with Nathan Wade, failed to show that she had a personal stake in the conviction of any defendant, failed to show that her relationship with Wade involved any actual impropriety on her part, and failed to show that their relationship, including their financial arrangements, had any actual impact on the case. Because there was some evidence presented to the trial

2

court that supported these findings, we are bound to accept them. *Neuman*, 311 Ga. at 88 (3). The majority does not dispute these findings. Rather, it holds, with the citation of no supporting authority and apparently for the first time in the history of our state, that the mere existence of an *appearance* of impropriety, in and of itself, is sufficient to reverse the trial court's refusal to disqualify the district attorney and her entire office. As shown below, the law does not support this outcome; rather, it compels precisely the opposite.

Where, as here, a prosecutor has no actual conflict of interest and the trial court, based on the evidence presented to it, rejects the allegations of actual impropriety, we have no authority to reverse the trial court's denial of a motion to disqualify. None. Even where there is an appearance of impropriety. Our binding precedent and the doctrine of *stare decisis* require our restraint and do not permit us to impose a different remedy than the one chosen by the trial court simply because we might see the matter differently and might have chosen to impose another remedy had we been the trial judge.

For at least the last 43 years, our appellate courts have held that an appearance of impropriety, without an actual conflict of interest or actual impropriety, provides no basis for the reversal of a trial court's denial of a motion to disqualify. This is true

3

in civil cases and criminal cases, and it applies to prosecutors. Our Supreme Court first addressed this issue in 1981 after a trial court disqualified an attorney based on an appearance of impropriety arising from the fact that counsel for a caveator was married to an attorney who previously represented the propounder of a will. Concluding that counsel should not be disqualified under these circumstances, the Supreme Court declared that "[a]lthough the issue has never been squarely addressed in Georgia, courts in other jurisdictions have rarely been willing to disqualify an attorney based on an appearance of impropriety alone where there is no danger that the actual trial of the case will be tainted." *Blumenfeld v. Borenstein*, 247 Ga. 406, 407-408 (276 SE2d 607) (1981). Accepting the trial court's finding that there was no actual impropriety but rather just an appearance of such, the Supreme Court held that disqualification could not stand.

> Appellees have not shown us a case where a per se rule was applied to disqualify an attorney on the basis of an appearance of impropriety alone. The Georgia cases cited by appellee do not stand for the proposition that a trial judge is authorized in Georgia to disqualify an attorney solely on the basis of an appearance of impropriety. . . . It is perhaps helpful to view the issue of attorney disqualification as a continuum. At one end of the scale where disqualification is always justified and indeed mandated, even when balanced against a client's right to an attorney of choice, is

the appearance of impropriety coupled with a conflict of interest or jeopardy to a client's confidences. In these instances, it is clear that the disqualification is necessary for the protection of the client. Somewhere in the middle of the continuum is the appearance of impropriety based on conduct on the part of the attorney. As discussed above, this generally has been found insufficient to outweigh the client's interest in counsel of choice. This is probably so because absent danger to the client, the nebulous interest of the public at large in the propriety of the Bar is not weighty enough to justify disqualification. Finally, at the opposite end of the continuum is the appearance of impropriety based not on conduct but on status alone. This is an insufficient ground for disqualification. This is particularly clear in this case in light of the trial court's specific finding that there was no actual impropriety on the part of any of the parties.

Id. at 409.[1]

---

[1] The trial court in *Blumenfeld* granted the motion to disqualify on the basis of Canon 9 of the then existing Code of Professional Responsibility, which provided: "A lawyer should avoid even the appearance of professional impropriety." Id. at 407. Notably, the Supreme Court revised Georgia's Rules of Professional Conduct, effective January 1, 2001, and among other changes removed Canon 9 and any mention of "appearance of impropriety" outside of the context of lawyers' direct dealings with a tribunal. See current Rule of Professional Conduct 3.5, comment 2 (imposing an "appearance" standard on lawyers whose conduct could be seen as "tampering with judicial impartiality"); compare Code of Judicial Conduct, Rule 1.2, comment 2 ("*Judges* must avoid all impropriety and appearance of impropriety") (emphasis supplied). The fact that the rules have changed since *Blumenfeld* gives us even more reason to defer to the trial court's refusal to disqualify the district attorney here. See *Herrmann v. GutterGuard, Inc.*, 199 Fed. Appx. 745, 755 (IV) (11th Cir.

In one of Georgia's leading criminal cases dealing with the disqualification of prosecutors, *Williams v. State*, 258 Ga. 305 (369 SE2d 232) (1988), there is no discussion of disqualification based on mere appearances. Rather, the entire discussion is premised on actual conflicts of interest (found not to exist here) and actual disqualifying "forensic misconduct" (likewise found not to exist here). In *Williams*, our Supreme Court held as follows:

> There are two generally recognized grounds for disqualification of a prosecuting attorney. The first such ground is based on a conflict of interest, and the second ground has been described as 'forensic misconduct.' A conflict of interest has been held to arise where the prosecutor previously has represented the defendant with respect to the offense charged, or has consulted with the defendant in a professional capacity with regard thereto; such conflict also has been held to arise where the prosecutor has acquired a personal interest or stake in the defendant's conviction.

2006) ("the [district] court properly applied the conflict of interest standard [Georgia Code of Professional Responsibility 1.9(b)] and did not apply the outdated appearance of impropriety standard [former Georgia Canon 9]"). As a leading scholar on disqualification has noted in describing this movement away from an appearance of impropriety standard, "prosecutors cannot realistically be expected to comply with the standards of impartiality required of judges"; in many states, "prosecutorial disqualification is deemed to be appropriate only when the remedy is needed to prevent the accused from suffering prejudice." Richard Flamm, Lawyer Disqualification (2014 ed.), § 31.3, p. 816.

6

Id. at 314 (2) (B), citing "The Nature and Consequences of Forensic Misconduct in the Prosecution of a Criminal Case," 54 Colum. L. Rev. 946 (1954). Here, there is no contention that the district attorney previously represented or consulted with any of the defendants, and there has been no showing that she has a personal interest or stake in any conviction. These facts support the trial court's conclusion that she has no actual conflict of interest.

In 2005, this court was faced with an appeal from a conviction where the defendant contended that a special prosecutor should have been disqualified. We explicitly rejected the argument that "the appearance of impropriety alone is sufficient to require a reversal" and labeled that argument "irrelevant to the case" given the fact that the defendant had "failed to demonstrate an actual conflict of interest." *Whitworth v. State*, 275 Ga. App. 790, 794 (1) (c) (622 SE2d 21) (2005). Elaborating on this point, this court stated that "no actual conflict of interest was shown. As previously noted, a prosecutor, who is not a judicial officer, is not held to as high a standard of independence and neutrality as is a judge. The Supreme Court of Georgia

has repeatedly held that an 'actual conflict of interest' is required to warrant reversal for failure to disqualify." Id. at 796 (1) (c).[2]

In *Kamara v. Henson*, 340 Ga. App. 111 (796 SE2d 496) (2017), disapproved on other grounds, *Fulton County v. Ward-Poag*, 310 Ga. 289 (849 SE2d 465) (2020), this Court was presented with the issue under consideration here – specifically, whether a trial court's denial of a motion to disqualify counsel based on an alleged appearance of impropriety should be overturned. Our holding could not have been clearer: "We affirm the trial court's denial of Kamara's motion to disqualify [d]efense [c]ounsel . . . *because the trial court did not abuse its discretion in denying the motion in the absence of an actual conflict of interest or actual impropriety*." (Emphasis added.) Id. at 111. Citing *Blumenfeld*, we elaborated:

> Absent an actual conflict of interest or actual impropriety, we cannot say that the trial court abused its discretion in denying Kamara's motion to disqualify [d]efense [c]ounsel. See *Blumenfeld v. Borenstein*, 247 Ga. 406,

---

[2] This court's opinion in *Whitworth* is physical precedent only because Judge Adams did not fully concur with all of the reasoning contained in the majority opinion. However, with respect to the issue discussed above, Judge Adams did fully concur with the other two judges. Writing separately, he stated that while he could not agree with all that was stated by the majority, he did agree with the result because there had been no adequate showing that the special prosecutor had an actual conflict of interest. Id. at 801-802. On this point, then, it appears that all three judges were in agreement.

8

409-410 (276 SE2d 607) (1981) (mere appearance of impropriety is an insufficient ground for disqualification). Consequently, we affirm the trial court's judgment in this regard. In sum, we affirm the denial of Kamara's motion to disqualify [d]efense [c]ounsel, because there is no actual conflict of interest or actual impropriety.

Id. at 116 (2).

In *Ga. Trails & Rentals, Inc. v. Rogers*, 359 Ga. App. 207 (855 SE2d 103) (2021), we once again affirmed a trial court's denial of a motion to disqualify counsel where there was no actual conflict of interest, stating:

Moreover, as the trial court found in denying the motion to disqualify, the appellants have presented no evidence of an actual conflict to support disqualification. The appellants repeatedly refer to 'potential' conflicts in this circumstance, but our Supreme Court has held that *absent an actual conflict of interest or actual impropriety, the trial court does not abuse its discretion in denying a motion to disqualify counsel.*

(Emphasis supplied.) Id. at 213-214 (1).

Finally, our Supreme Court reiterated these principles less than a year ago in a criminal case involving a motion to disqualify a prosecutor based on an alleged conflict of interest. In *Lee v. State*, 318 Ga. 412 (897 SE2d 856) (2024), the Supreme Court affirmed the denial of the motion to disqualify, succinctly declaring that "the

9

trial court did not abuse its discretion . . . by failing to disqualify the Assistant District Attorney *absent an actual conflict of interest*."[3] (Emphasis supplied.) Id. at 412-413.

The majority opinion in this case cannot be reconciled with any of these cases, but we are bound to follow them. "*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U. S. 808, 827 (111 S.Ct.

---

[3] *Lee* is notable because it involved a motion to disqualify a prosecutor. Thus, any suggestion that *Blumenfeld* and its progeny do not apply to prosecutors is dispelled completely by *Lee*. Further, all of these cases are consistent with the often repeated principle that disqualification of counsel is an extraordinary remedy that should be granted sparingly. *Hodge v. URFA-Sexton, LP*, 295 Ga. 136, 139 (1) (758 SE2d 314) (2014); *Bernocchi v. Forcucci*, 279 Ga. 460, 462 (2) (614 SE2d 775) (2005); *Blumenfeld*, 247 Ga. at 408-409. This principle is just as true for prosecutors, including an elected district attorney, as it is for private attorneys, and there is no good reason not to apply it here. "The elected district attorney is not merely any prosecuting attorney. [Sh]e is a constitutional officer, and there is only one such officer in each judicial circuit." *McLaughlin v. Payne*, 295 Ga. 609, 612 (761 SE2d 289) (2014), citing Ga. Const. of 1983, Art. VI, Sec. VIII, Para. I (a). The district attorney was elected by the voters of her circuit. We should tread lightly when asked to deprive the electorate of the attorney they chose to perform this job, especially where there has been no finding of an actual conflict of interest or actual impropriety. See, e. g., *State v. Giese*, 386 N. C. 127, 137 (V) (900 SE2d 881) (2024) (disqualification of elected district attorney interferes with her performance of constitutionally mandated duty and cannot stand in the absence of "an actual conflict of interest or legitimate due process concerns").

2597, 114 LEd2d 720) (1991). If we are not going to follow binding precedent and have no good reason to overrule it, all of these virtues of *stare decisis* are threatened.

In this case, the trial court expressly found that the district attorney had no conflict of interest and rejected the allegations of actual impropriety arising from her relationship with Nathan Wade. It rejected the notion that she received any material financial benefit from her hiring of Wade, that she hired him as part of a scheme to enrich herself, or that their financial arrangements had any impact on this case. It was certainly critical of her choices and chastised her for making them. I take no issue with that criticism, and if the trial court had chosen, in its discretion, to disqualify her and her office, this would be a different case. But that is not the remedy the trial court chose, and I believe our case law prohibits us from rejecting that remedy just because we don't like it or just because we might have gone further had we been the trial judge. See *State v. Evans*, 187 Ga. App. 649, 651 (3) (371 SE2d 432) (1988)(decision to disqualify prosecutor based on appearance of impropriety "is within the discretion of the trial court and the appellate courts will not interfere where, as here, the court's discretion was not abused"), overruled on other grounds, *State v. Smith*, 268 Ga. 75, n.7 (485 SE2d 491) (1997); *First Key Homes of Ga., LLC v. Robinson*, 365 Ga. App. 882, 882 (880 SE2d 371) (2022) ("The ultimate determination of whether an attorney

should be disqualified from representing a client in a judicial proceeding rests in the sound discretion of the trial judge.") (citation and punctuation omitted); *Bowers v. CSX Transp., Inc.*, 369 Ga. App. 875, 883-884 (b) (894 SE2d 690) (2023) ("review under abuse of discretion standard recognizes that there is a range of possible conclusions the trial judge may reach and we will affirm a trial court's decision even though we would have gone the other way had it been our call") (citation and punctuation omitted). See also, *United States v. Miller*, 624 F.2d 1198, 1201 (III) (3rd Cir. 1980) (abuse of discretion standard applies to trial court's chosen remedy on motion to disqualify; trial court "has a wide discretion in framing its sanctions to be just and fair to all parties involved") (citation and punctuation omitted).

Every day in courtrooms all over this state, trial judges solemnly and diligently fulfill their constitutional obligations and perform a vital and indispensable public service when they convene hearings, listen to testimony, observe witnesses, make credibility determinations, resolve conflicts in the evidence, weigh the evidence, and exercise their discretion in countless ways. We should not lightly interfere with their work or weaken their discretion by imposing our will because we don't like the result. Because I am convinced that is what the majority has done in this case, I respectfully dissent.